Cite as 2024 Ark. App. 606

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. E-23-263

| | |
|---|---|
| CITY OF FORT SMITH<br><br>APPELLANT | Opinion Delivered December 11, 2024 |
| V. | APPEAL FROM THE ARKANSAS BOARD OF REVIEW |
| DIRECTOR, DIVISION OF WORKFORCE SERVICES; AND MARTIN BOSCO<br><br>APPELLEES | [NO. 2023-BR-00115]<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The City of Fort Smith (City) appeals from an order issued by the Arkansas Board of Review (Board) awarding unemployment-compensation benefits to Martin Bosco. We affirm.

### I.  *Relevant Facts*

On August 16, 2022, Martin Bosco was fired for insubordination from his position with the City. Bosco filed a claim for unemployment benefits that the Division of Workforce Services denied, finding that Bosco was discharged from work for insubordination and dishonesty. On October 28, Bosco appealed the determination to the Appeal Tribunal (Tribunal), and a hearing was held on the matter.

At the hearing, the hearing officer acknowledged the inclusion in the record of a two-page disciplinary memorandum from the City, and counsel for the City summarized the memorandum in the opening statement. The memorandum provided the following information. Bosco worked for the City in the information-technology department for twenty-one years; however, on the day of his termination, he was employed as a water-project specialist. On Friday, August 12, Bosco was informed during a meeting with City Administrator Carl Geffken, Human Resources Director Rick Lolley, and Utility Director Lance McAvoy that starting the following Monday, he would be transferred to the water-project-specialist position and receive a 3 percent pay increase. During the meeting, Bosco was ordered to return his city-issued cell phone, laptop, identification badge, and access card. Bosco "wiped" the cell phone, returning it to factory settings, and returned it along with his identification badge and an access card. He did not inform the others in the meeting that he had a second access card, and he did not turn it in at that time. Bosco was told not to reenter the IT building without an escort and to report to the utilities department on Monday. Before leaving work that day Bosco told McAvoy that he had turned in his laptop; however, he had not done so. After work on Friday, Bosco returned to the IT building and used his second access card to enter the building. There, McAvoy saw Bosco with the laptop that he earlier stated he had returned. On the following Tuesday, Bosco was fired for misconduct based on his dishonesty, unauthorized reentry into the building, and failing to return his access card as ordered.

Bosco testified that in the last few years before he was fired, he worked for the City in the IT department as a cyber-security administrator. During his employment, he had never received a negative performance review or any criticism of his job performance. Bosco testified that in June and July, the IT department underwent an audit regarding patch management and firewall concerns, and "what policies did we have, you know, what were our pitfalls." City Administrator Carl Geffken told Bosco not to answer the auditor's questions. The auditor explained to Bosco that he was required to answer the questions, and Bosco answered them to the best of his ability. The auditor compiled reports from the audit, and the reports were published to the City's website around the end of July. In early August, immediately after the audit report was published, Bosco contracted COVID-19 and was absent from work for a week. On August 12, after Bosco had returned to work, he was asked to attend a meeting with Geffken, McAvoy, and Lolley. Geffken told him the purpose of the meeting was to transfer him to the position of water-project specialist "due to my, you know, impressive track record and—and credentials, they really needed me to focus on this new task." Geffken also stated Bosco had been seen speaking with an auditor, and he was upset and "felt that was wrong." Nonetheless, Bosco was told to start his new position Monday. Bosco was not given a job description, and there was no discussion regarding Bosco's transition to the new job. Bosco was not told that his access to the IT building was restricted, and in fact, Bosco was informed he would work at both the IT building and the Kelley Highway location. He was asked to return his phone, but no one informed him that any passcodes should remain on the phone. Bosco explained that he never kept passcodes,

3

passwords, or passphrases on his phone, and all that information was kept in other records that could be accessed by his supervisor if needed. Bosco reset the phone to factory settings, as was the customary practice when he collected phones from employees who left work. He noted that sometimes employees wiped their own phones before returning them, and there was no written policy regarding this practice. Bosco was told to return his laptop and any other technological device that he used for work. Bosco also returned his primary identification badge and access card because Lolley had explained to him that he would need a new badge displaying his new job title. When the workday ended and Bosco was leaving the building, McAvoy asked him if he had turned everything in, and he said yes, though he did not remember specifically mentioning the laptop. When he was halfway home, he realized the laptop was in the backseat of his truck, and he returned to the office to leave it on his desk as instructed. Bosco saw McAvoy's car in the parking lot and assumed he was still in the building. Bosco used his second blank access card (without his photo and job description) to enter the building. McAvoy came to Bosco's office as he was trying to check his email before he returned the laptop, and McAvoy told him he could not check his email. McAvoy told Bosco to leave the second access card and laptop in the office, and then McAvoy watched Bosco leave the building. Bosco explained that the City routinely issued secondary access cards or fobs to employees when requested, and around three hundred of approximately nine hundred employees had secondary cards. There was no written policy regarding the production of secondary cards, and Geffken, McAvoy, and Lolley had not ordered him to return his second card during the meeting. Bosco was never told he was

restricted from the building, and he assumed he would have access to the building during the transfer period to assist the new IT director. On Monday, Bosco reported to work at 8:00 a.m. McAvoy discussed Bosco's new duties with him, and when Bosco asked about the job description and pay grade, McAvoy said he was working on it. Then, McAvoy asked Bosco to sit in the breakroom. Within fifteen minutes, Lolley and McAvoy entered the breakroom and ordered Bosco to go home. On Tuesday, McAvoy called Bosco and told him to meet him at the IT building. Once inside, Lolley read the disciplinary memorandum aloud to Bosco and terminated his employment. Bosco explained to Lolley and McAvoy he had no intention of being insubordinate, he had done his best to comply with their requests, and there was a "gross misunderstanding." Later, Bosco learned that there was no water-project-specialist job title. Bosco noted that he was paid for August 15 and 16 at his IT pay rate and not the increased rate that was to come with his transfer.

After the hearing, the Tribunal entered into evidence the hearing officer's written determination denying benefits, finding that Bosco was fired for misconduct—specifically, for his deception of his employer, pursuant to Ark. Code Ann. § 11-10-514(b) (Supp. 2023). The Tribunal found that Bosco was insubordinate and dishonest when he entered the building using a duplicate badge that the employer had no knowledge of, wiped his phone before returning it, and failed to return his work laptop during the meeting, instead returning it "under secretive conditions."

Bosco appealed the Tribunal's determination to the Board. The Board reversed the decision, stating that it relied on the documents and testimony presented to the Tribunal.

The Board also found that the record contained an email sent on October 4 recounting the meeting on August 12 with Bosco regarding his transfer, 3 percent raise, and orders to turn in his employer-issued phone, computer, identification badge, and computer access codes. The email contained the same information as the disciplinary memorandum, including that Bosco wiped his phone without asking and without his employer's knowledge, and he was told he was not allowed to enter the IT building without an escort, which he later did. The Board recounted Bosco's testimony. Also, the Board clarified that it would not consider the City's *opening statement* by counsel regarding the contents of the disciplinary memo as evidence; however, the Board also stated that the documentary evidence was "substantive." The Board addressed the weight of the evidence, finding that

> [t]he employer heavily relies upon hearsay documentation in the written record in this case. In its email and memorandum, the employer asserted that the claimant was discharged for erasing important information from a cellphone, entering a building using a duplicated access code, lying about turning in a laptop while accessing the employer's facilities without permission. The claimant presented sworn testimony rebutting these assertions. Sworn testimony carries greater evidentiary weight, and the Board finds the claimant's testimony credible.

The Board determined that Lolley's statement that Bosco wiped the phone without the knowledge of his supervisor lacked credibility, and regarding the laptop, the Board found Bosco's version of events to be more credible. The Board stated that the City's

> contention that the claimant was told to not enter the employer's facility without an escort is curious. The employer did not indicate that the August 12 meeting was a disciplinary meeting. There may have been a good reason for why an employee may be so told, but the employer did not provide one aside from a vague statement about security, nor did the employer provide witnesses that could be asked.

6

The Board decided that even if Bosco had entered the building without his employer's consent, Bosco did not do so in a way that was intended to disregard his employer's interests. The Board found that the City had not established that having an additional access card was contrary to its interest and that Bosco "testified that many such cards had been issued, and his testimony is more persuasive than the hearsay documents." The City timely filed its notice of appeal, and this appeal followed.

I. *Discussion*

A. Reliance on New Evidence

On appeal, the City asserts that it is likely that Board impermissibly considered new evidence. Specifically, the City argues that Bosco's posthearing sixteen-page document dated January 5, 2023, and titled "2nd Appeal" is included in the record, which implies that it was considered by the Board. The City contends that the document, which was not served on the City, includes references to the City's human resources handbook, information regarding Bosco's pay for the new position, argument that Bosco's supervisor was fraudulent in his communications with him, and statements regarding "unnamed 'administrators'" who could have known about his second access card. The City's argument is not well taken.

In *Thomas v. Director*, 2019 Ark. App. 468, at 3–4, 587 S.W.3d 612, 615–16 (citations omitted), we set forth the following standard of review in employment cases and the criteria to prove that the employee was fired for misconduct:

> Board decisions are upheld if they are supported by substantial evidence. Substantial evidence is such relevant evidence that reasonable minds might accept as adequate to support a conclusion. In appeals of unemployment-compensation cases,

7

we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. Even if there is evidence that could support a different decision, our review is limited to whether the Board could have reasonably reached its decision as a result of the evidence presented. However, our function on appeal is not merely to rubber-stamp decisions arising from the Board.

When an individual is discharged from employment, the employer has the burden of proving by a preponderance of the evidence that the employee engaged in misconduct. Misconduct, for purposes of unemployment compensation, involves (1) disregard of the employer's interest, (2) violation of the employer's rules, (3) disregard of the standards of behavior the employer has a right to expect of its employees, and (4) disregard of the employee's duties and obligations to the employer. Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion do not rise to the level of misconduct. There must be an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design.

The City acknowledges that the Board's January 27 letter is also in the record and states that the appeal had been received and "the Board of Review will make its decision in this matter based upon a review of the entire record of evidence as forwarded to the Board of Review by the Appeal Tribunal." The letter further provides that "the Board of Review is without jurisdiction to accept or consider as evidence any submissions made by the parties *after the closure of the record* by the Appeal Tribunal without further hearing or consideration of any additional information offered." (Emphasis added.) Additionally, at the close of the hearing, the Tribunal hearing officer stated that "[t]he record in Docket No. 2022-AT-08022 is now closed."

The City contends that the Board did not refer to any specific postappeal submissions that would *not* be considered or that specific postappeal submissions would be discarded.

8

The Board's letter notice regarding the exclusion of any new evidence, the City contends, is insufficient to overcome the requirement set forth in Ark. Code Ann. § 11-10-525(c)(1) (Repl. 2012) that "[u]pon review on its own motion or upon appeal and on the basis of evidence previously submitted in the case, or upon the basis of any additional evidence as it may direct be taken, the Board may affirm, modify, reverse, dismiss, or remand the case." The City also contends that *Brewer v. Everett and Leckenby Co.*, 3 Ark. App. 59, 621 S.W.2d 883 (1981), and *Brown Jordan v. Dukes*, 269 Ark. 581, 600 S.W.2d 21 (Ark. App. 1980), support its argument that the Board must specifically reject any evidence offered after the hearing. Both *Brewer* and *Brown Jordan* are distinguishable from the instant case.

In *Brown Jordan*, an employee lost his appeal to the Tribunal. While the appeal to the Board was pending, Brown's coworker signed a statement that was sent to the Board containing new information. Notice of the letter was not sent to the employer, and the Board did not direct that the evidence be taken; however, in its decision reversing the Tribunal "the board of review emphasized" facts from the statement in its determination in Brown Jordan's favor. *Brown Jordan*, 269 Ark. at 583, 600 S.W.2d at 23. This court held that the Board's consideration of the statement sent while the appeal to the Board was pending constituted a denial of due process, and it was not harmless error. *Brown Jordan* is distinguishable because here, the Board clearly stated twice that the record had been closed at the end of the hearing, and there is no indication that the Board relied on the "2nd Appeal" document in the decision to award benefits.

9

Similarly, in *Brewer*, the employee seeking unemployment benefits provided a letter to the Board containing new evidence. This court held that "there is nothing in the record to refute this charge. It is not contended by appellees that appellant had notice of the letter, nor is it contended that the letter was not a factor in the decision of the Board." *Brewer*, 3 Ark. App. at 60, 621 S.W.2d at 884. Herein lies the difference. The record in this case contains multiple instances when the case file specifically was closed to additional evidence. The City identifies new facts in Bosco's letter; however, there is no indication that the Board relied on the letter or any new information.

Our caselaw does not support the City's argument that the Board committed reversible error by not specifically rejecting the new evidence offered in the "2nd Appeal" letter submitted after the hearing. On this point we affirm.

B. Hearsay Evidence in Unemployment Cases

The City argues that the Board erred by failing to consider evidence the Board improperly determined was hearsay. The City contends that the disciplinary memorandum written by McAvoy was not hearsay because McAvoy discussed the facts later included in the memorandum with Bosco, and the statements in the memorandum are based on what McAvoy observed; thus, for the first time on appeal, the City argues that the memorandum was a record made as a part of a regular business activity. We decline to address the merits of this argument. It was not made below, and this court does not consider issues raised for the first time on appeal. *Hampton v. Dir.*, 2023 Ark. App. 352, at 3, 673 S.W.3d 804, 807.

Additionally, the City argues that it does not matter if the memorandum is hearsay because the Arkansas Rules of Evidence do not apply to administrative tribunals. The City's argument fails because the Board considered the documentary evidence. The Board found that it would not consider counsel's *opening statement* summarizing the disciplinary memorandum; however, the Board explained that

> the Board *may consider the documentary evidence as substantive*. However, the facts *as presented by the employer's attorney* will not be considered evidence as the attorney was merely relaying the employer's position and was not involved in the separation.

(Emphasis added.)

The City's argument relies on the Board's refusal to consider the memorandum; however, the Board clearly states in its decision that it weighed the memorandum against Bosco's conflicting testimony, and it was the attorney's summary of the document that could not be considered. Moreover, at the Tribunal hearing, the hearing officer specifically noted that the disciplinary memorandum is part of the record, stating, "I have an email from Rick Lolley, . . . I also have an insubordination statement from the employer." We find no error and affirm.

## C. The Weight of Oral Testimony

The City contends that the Board's statement that "[s]worn testimony carries greater evidentiary weight, and the Board finds the claimant's testimony credible" implies that the Board did not exercise its discretion to weigh the evidence, automatically giving Bosco's testimony more weight than the City's documentary evidence. We disagree.

11

The Board exercised its discretion by carefully weighing the evidence, making extensive findings, and establishing a thorough record:

> While the claimant admitted to resetting the phone, he did so in full view of supervisors and human resources personnel, making Lolley's email suggesting that the administrator was not aware that the claimant reset the phone during the meeting noncredible. The Board finds the employer's assertion that the claimant lied about turning in a laptop to be less credible than the claimant's testimony that he did not do so. The employer's contention that the claimant was told to not enter the employer's facility without an escort is curious. The employer did not indicate that the August 12 meeting was a disciplinary meeting. There may have been a good reason for why an employee may be so told, but the employer did not provide one aside from a vague statement about security, nor did the employer provide witnesses that could be asked. Again, the claimant's testimony that he was not told he could not access the facility is credible. Moreover, even if the claimant was not allowed in the building, the employer has not shown by a preponderance of the evidence that the claimant did so in willful disregard of the employer's interests. The claimant testified that he did not think that his entering a facility at which he worked to turn in a laptop was a "big deal," and the Board believes him. This leaves the Board with the employer's assertion that the claimant created a duplicate access identification card. The claimant testified that many such cards had been issued, and his testimony is more persuasive than the hearsay documents. As such, the employer has not established that his having an additional access card was an intentional disregard of its interests. The claimant also presented evidence suggesting that there may have been some other element which impelled the employer to discharge him, namely his prior conversation with a city auditor. However, the Board need not address it because the onus is on the employer to prove that the claimant was discharged for misconduct connected with the work, and it has not done so.

The specific, detailed findings demonstrate that the Board weighed Bosco's testimony against the evidence presented by the City and found that Bosco's testimony carried greater weight; thus, the Board clearly exercised its discretion. Accordingly, we affirm.

Affirmed.

KLAPPENBACH and BARRETT, JJ., agree.

*Daily & Woods, P.L.L.C.*, by: *Douglas M. Carson*, for appellant.

12

*Cynthia L. Uhrynowycz*, Associate General Counsel, for appellee.